[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 21, 2007
THOMAS K. KAHN
CLERK

No. 07-10383
Non-Argument Calendar

_____

D. C. Docket No. 06-00237-CR-TCB-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEPHANIE N. COWLING,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 21, 2007)**

Before BIRCH, HULL and WILSON, Circuit Judges.

PER CURIAM:

After pleading guilty, Stephanie N. Cowling appeals her 42-month sentence

for conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. §§ 1341, 1343, 1349.  After review, we affirm.

## I.  BACKGROUND

**A.    Offense Conduct**

From approximately July 2000 through May 2002, Cowling was employed as a Line Haul Manager at Excel Direct Incorporated ("Excel").  From approximately December 2002 through September 2003, Cowling was employed as a Domestic Manager at DHL Danzas Air & Ocean ("DHL").  While in these positions, Cowling and her husband devised a scheme to defraud her employers by establishing Eric Nelams as a vendor for the companies and then causing $453,054.40 in payments to be mailed to Nelams for fictitious freight bills.

Cowling's fraud was discovered after DHL conducted an internal audit, which revealed that Cowling had circumvented the automated system and initiated payments to Nelams through a manual process.  Specifically, Cowling approved the payments to Nelams and then faxed the invoices to the accounts payable department for processing.  The audit revealed that the work for which Cowling authorized payment was actually performed by another company, Cargo Express.

After the DHL embezzlement scheme was uncovered, Cowling and her husband met with Nelams and his wife.  Cowling wanted Nelams to get "on the

2

same page" before they were interviewed by DHL security personnel. Cowling gave Nelams two documents: (1) a freight bill in the amount of $2,900 in Nelams's name and signed by Cowling; and (2) a document in Cowling's handwriting containing trucking and billing language as well as explanations. Cowling also urged Nelams to accept the blame for the fraud, but Nelams resisted.[1]

A federal grand jury returned a sixty-count indictment charging Cowling with conspiracy to commit wire and mail fraud and with multiple counts of mail fraud, wire fraud and transporting checks taken by fraud in interstate commerce. Cowling pled guilty to the conspiracy count pursuant to a written plea agreement.

**B.      PSI**

The Presentence Investigation Report ("PSI") assigned Cowling a base offense level of 6, and increased her offense level to 14 because the loss was more than $400,000 but less than $1,000,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(H). After a two-level increase because the offense involved an abuse of a position of trust, see U.S.S.G. § 3B1.1(c), and three-level reduction for acceptance of responsibility, see U.S.S.G. § 3E1.1(a)-(b), the PSI recommended a total offense level of 19 and a criminal history category of I, resulting in an advisory guidelines range of 30 to 37 months' imprisonment. The government objected to the PSI's

---

[1]Shortly after the meeting, Nelams was found murdered outside his residence.

failure to include a two-level enhancement because the offense involved sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(8)(C) (2002).[2]

**C.     Sentencing**

At the sentencing hearing, the government presented witness testimony regarding the nature and scope of Cowling's embezzlement schemes to support a § 2B1.1(b)(8)(C) sophisticated means enhancement. Wade Sorenson, the Director of Domestic Operations for DHL, conducted the internal audit that eventually uncovered Cowling's embezzlement scheme. Sorenson testified that during the audit, he discovered: (1) duplicate entries of services that had already been provided by a functioning vendor; and (2) duplicate charges that were "put in to be paid" to a vendor of whom he was not aware. Sorenson contacted, among others, his regional manager, Mike Ginnis, who then contacted Cowling to determine if she knew who this vendor was. Upon being questioned about this vendor, Cowling indicated that she knew who the vendor was, but would have to gather and review certain paperwork before discussing the matter further.

Sorenson also stated that Cowling's scheme was difficult to uncover because she engaged in "manual cost manifest," which was a recognized process at DHL for a Domestic Manager. Sorenson explained that this manual process allowed

---

[2]To avoid ex post facto problems, the district court applied the 2002 Sentencing Guidelines in effect on the date of Cowling's offense. See U.S.S.G. § 1B1.11(b)(1).

4

Cowling to pay an invoice that was not in the computer system and that the scheme was finally detected because of the repetition and unusual amount of the payments. According to Sorenson, Cowling carried out the scheme by taking invoices from DHL's local vendor in Atlanta and copying that information, which included the house air bill number (a file reference number for each individual shipment) as well as the date and weight of the pieces to be shipped, and then sending the invoices to the department that paid them. Sorenson also stated that during his investigation he did not find any original invoices in the files, which suggested that they were either removed or destroyed.

Robert Betzer, District Manager at DHL in Atlanta, testified that Cowling left work shortly after being asked to provide documentation verifying that Nelams was a vendor and had submitted invoices to DHL. Betzer stated that he was unable to find any documents in Cowling's office that indicated that Nelams was a vendor with whom DHL did business.

Both Betzer and Sorenson were shown a handwritten document found in Nelams's home that contained the names of several DHL employees and their job descriptions. Sorenson described this document as a "cheat sheet" that contained information about DHL that a typical vendor-supplier would know. Betzer indicated that the document listed key contacts within DHL's organization.

5

Linda Beth, Cowling's direct supervisor at Excel, testified that at the time Cowling was terminated for performance-related problems, Excel was unaware of Cowling's fraud. Beth learned of the scheme only after she received a telephone call from Excel's security personnel, who had been notified by DHL that it had been defrauded by Cowling. After an investigation, Beth discovered that Cowling committed fraud by creating fictitious paperwork and using Excel's computer system.

According to Beth, the normal practice at Excel was to bill at the time the load was shipped, which would create a manifest that the warehouse could use to check off for each piece of shipment. However, Cowling billed only after the invoices were received, so no manifest was created that could be checked off. Cowling submitted invoices on behalf of Nelams claiming delivery of items for which orders had been cancelled before shipment. In addition, Cowling would override the computer system to alter the originating shipping destination and maximize the amount of money paid for the fictitious shipment. Beth testified that she was never able to figure out how Cowling manipulated the paperwork to input Nelams as a vendor in Excel's computer system.

Finally, Cathy Nelams, Nelams's sister, testified that Nelams, who was never involved in the trucking business, told her that he was approached about

being involved in the fraud scheme by Cowling's husband. The week of Nelams's murder, Nelams met with the Cowlings, and Stephanie Cowling "wrote out a script" for Nelams of what he was supposed to say when company investigators called.

After presenting this evidence, the government argued that the overall nature of Cowling's scheme made it sophisticated. Cowling objected, arguing, inter alia, that the government had not met the higher "sophisticated means" standard.

The district court sustained the government's objection, concluding that Cowling's offense involved sophisticated means, as follows:

> [I] think that [the fraud] did involve particularly complex or especially intricate conduct pertaining to the execution and particularly the concealment of the crime. I don't agree that this was a garden variety fraud in light of not only the testimony today, but the stipulated facts and conceded facts in the presentence report. These were repeated acts over an extended period of time that were not merely opportune, and in my judgment they were sufficiently complex and intricate to justify the description sophisticated means.

After adding the two-level sophisticated means enhancement, the district court found that Cowling's adjusted offense level was 21 and her criminal history category was I, yielding an advisory guidelines range of 37 to 46 months' imprisonment. The district court imposed a 42-month sentence and ordered Cowling to pay $453,054.40 in restitution.

Cowling filed this appeal.

## II. DISCUSSION

On appeal, Cowling argues that the district court erred in imposing the sophisticated means enhancement.[3] Section 2B1.1(b)(8)(C) of the Sentencing Guidelines provides for a two-level enhancement if the offense involved sophisticated means. U.S.S.G. § 2B1.1(b)(8)(C).[4] The commentary defines sophisticated means as:

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1, cmt. n.6(B).

Given the overall evidence in this case, the district court did not err in imposing the sophisticated means enhancement. Rather than mere double-billing, Cowing's fraud scheme was complex and involved the use of her specialized

---

[3]In addressing a § 2B1.1(b)(8)(C) enhancement for sophisticated means, we review the district court's factual findings for clear error and the application of the guideline provision to those facts de novo. United States v. Humber, 255 F.3d 1308, 1311 (11th Cir. 2001). Here, Cowling does not challenge any of the district court's factual findings, but rather argues that the facts established do not rise to the level of sophisticated means.

[4]We reject as meritless Cowling's claim that the district court applied the "more than minimal planning" standard of now-obsolete U.S.S.G. § 2F1.1 (2000). A review of the record reveals that the district court was aware of and applied the applicable "sophisticated means" standard found in U.S.S.G. § 2B1.1(b)(8)(C).

knowledge of the business operations and the computer and bookkeeping systems at Excel and DHL to create and then hide the transactions. For example, Cowling's offense involved establishing Nelams, who had never been involved in trucking, as a third-party vendor and creating fictitious invoices to perpetrate her scheme. Cowling then manipulated Excel's computer system to change the originating shipping destination to maximize the amount of money that was paid for the fictitious shipments and manipulated DHL's computer system to pay invoices that were not entered into the computer system. Additionally, Cowling attempted to avoid detection of the DHL scheme by providing Nelams with details about the scheme and DHL's business operations. Cowling's schemes were difficult to detect because of the careful and intricate methods she used to conceal them. Indeed, Excel did not discover the fraud until it learned of the fraud at DHL.

Considering the nature and scope of the embezzlement schemes, the magnitude of the amount of loss – almost $500,000 – and given that Cowling engaged in repeated fraudulent acts at two different companies for an extended period of time, the district court did not err in finding that Cowling's conduct involved sophisticated means.

**AFFIRMED.**

9